*NOT FOR PUBLICATION*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
:
RICHARD ANNUNZIATA,                 :
                                    :
            Plaintiff,              :      Civil Action No. 16-662(FLW)
                                    :
v.                                  :
                                    :      **OPINION**
                                    :
NEW JERSEY RACING COMMISSION        :
and RICHARD O'DONNELL,              :
                                    :
            Defendants.             :
                                    :
_____ :

**WOLFSON, United States District Judge:**

Presently before me is the motion of Defendants New Jersey Racing Commission and Richard O'Donnell, the State Steward, (collectively, "Defendants"), to dismiss Plaintiff Richard Annunziata's ("Plaintiff" or "Annunziata") Complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Plaintiff brought this suit pursuant to 42 U.S.C. § 1983, alleging that (1) Defendants deprived Plaintiff of his constitutionally protected property interests, including his right to employment in the horse racing business and to procure a stable license, when O'Donnell recommended against Plaintiff's licensure with the New Jersey Racing Commission ("NJRC"); and (2) Defendants have, instead, knowingly approved hundreds of license applications from illegal immigrants using falsified security numbers. The Complaint seeks damages, declaratory relief, and various forms of temporary and permanent injunctive relief. For the reasons set forth below, Defendants' motion to dismiss is **GRANTED**.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On a motion to dismiss, the Court reviews the Complaint by taking its allegations as true. The NJRC, a state agency in the Department of Law & Public Safety, is responsible for regulating the horse racing industry in the state of New Jersey. Compl., ¶ 16. As the state's regulator of the horse racing industry, one of NJRC's duties is to review individual license applications. As the Complaint expressly states, "[o]nly the NJRC has the statutory and regulatory authority to issue or refuse to issue a license, or suspend or revoke a license in connection with horse racing." *Id.* at ¶ ¶ 17, 18. Annunziata alleges that he has been licensed by the NJRC to train and race horses since 1983 without any infractions or suspensions.[1] *Id.* at ¶ 19.

On September 15, 2016, Annunziata completed an application with the NJRC for a license as a stable worker. *Id.* at ¶ 23. After completing his application, Annunziata was asked to meet with O'Donnell before a license could be issued. *Id.* at ¶¶ 23-24. During the meeting, O'Donnell informed Annunziata that Annunziata's license application would be denied on the basis of financial irresponsibility, pursuant to N.J.A.C. 13:70-412. *Id.* at ¶ 24.

On September 21, 2016, Annunziata and his counsel, Bruce J. Duke, Esq. ("Plaintiff's Counsel"), formally met with O'Donnell and two other representatives from the NJRC to discuss Annunziata's application. *Id.* at ¶ 25. At this conference, Defendants, allegedly, informed Annunziata that he had previously been conducting unauthorized racing activities at a state licensed farm. *Id.* at ¶ 25. On September 22, 2016, Annunziata received a letter from O'Donnell stating that Plaintiff's application for a 2016 NJRC Thoroughbred Grooms license had been

---

[1] Plaintiff does not make clear whether the type of license that he currently holds is the same kind of license for which he applied in connection with this lawsuit. Presumably, those two licenses are different. In any event, I note although it was not pled in the Complaint, Defendants, in their briefing, assert that Plaintiff, currently, holds no license, since in 2009, his racing license was revoked by NJRC.

reviewed by O'Donnell, and that O'Donnell had not recommended Annunziata for a NJRC license due to his continuing involvement with racing without a current NJRC license. *See Id.* at Ex. C. The letter went on to explain that Annunziata had the option to request a hearing with the Deputy Director of the NJRC if he was dissatisfied with O'Donnell's decision. *Id.* After receiving the letter, Annunziata did not request a hearing or take any other steps to administratively appeal the decision.[2] *Id.* at ¶ 29. No official NJRC decision was rendered in response to Annunziata's application.

After receiving O'Donnell's letter, Annunziata spoke with O'Donnell again, inquiring why Plaintiff's license application had not been approved. During this conversation, Annunziata also accused the NJRC of approving applications submitted by illegal immigrants with falsified social security numbers. *Id.* at ¶ 30. Annunziata further alleges that O'Donnell conceded (1) that the NJRC does, in fact, approve license applications from illegal immigrants containing falsified social security numbers, and (2) that the NJRC had "succumb[ed] to pressure from a well-connected attorney in racing circles, whose clients have dischargeable debts against plaintiff, who apparently called … O'Donnell and his colleagues that they should not approve a license to plaintiff." *Id.*

In addition, Annunziata avers that, after conducting his own investigative research, he concluded that eighty percent of the grooms that were issued NJRC licenses are undocumented illegal immigrants, and used counterfeit social security numbers to obtain their licenses. *Id.* at ¶ 32. Annunziata also expresses his belief that Defendants have "undertaken a 'scorched earth' campaign against any individual associated with [Annunziata]," citing as evidence, a fine levied

---

[2] Plaintiff explains in his Complaint that, because the Commissioner to whom Plaintiff would appeal O'Donnell's decision is O'Donnell's supervisor, pursuing the statutorily-required administrative appeal would be "a complete waste of time." Compl. at ¶ 29.

3

against one of the farms he may have visited, and "harassment" by Defendants of Plaintiff's wife, brother, and father (all of whom are involved in the racing community). *Id.* at ¶ 35.

Plaintiff brings this § 1983 action against Defendants, asserting three causes of action: 1) violation of 42 U.S.C. § 1983; 2) declaratory relief pursuant to 28 U.S.C. § 2201; and 3) temporary restraints. In the instant matter, Defendants move to dismiss the entirety of the Complaint based on, *inter alia*, standing and failure to exhaust administrative remedies.

## DISCUSSION

### I. Standard of Review

*A. Rule 12(b)(1) Standard*

Under Fed. R. Civ. P. 12(b)(1), a court must grant a motion to dismiss if said court lacks subject matter jurisdiction to hear a claim. *Prof'l Orthopedic Assocs., PA v. Excellus Blue Cross Blue Shield*, 2015 U.S. Dist. LEXIS 91815, *9 (D.N.J. July 15, 2015) (citing Fed. R. Civ. P. 12(b)(1)). "A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810, 48 V.I. 1059 (3d Cir. 2007) (citing *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000) ("The issue of standing is jurisdictional.")). The plaintiff must establish standing, "and 'each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *FOCUS v. Allegheny Cnty. Court of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996)).

When considering a Rule 12(b)(1) motion to dismiss, a court must determine whether the motion is taking aim at a complaint's alleged deficiency on its face, or whether the motion attacks a lack of subject matter jurisdiction in fact, apart from any pleadings. The answer to this question

determines how the pleadings are reviewed. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *see also Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (discussing facial attacks); *Constitution Party v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (citing *Mortensen*, 549 F.2d at 891) ("A factual attack, on the other hand, is an argument that there is no subject matter because the facts of the case—and here, the District Court may look beyond the pleadings to ascertain the facts—do not support the asserted jurisdiction."). In short, "a facial attack 'contests the sufficiency of the pleadings, whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'" *Constitution Party*, 757 F.3d at 358 (quoting *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008)) (internal quotation marks omitted) (alterations in original). However, the "facial-factual" question is not the end of the standing analysis. "It is axiomatic that, in addition to those requirements imposed by statute, plaintiffs must also satisfy Article III of the Constitution." *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 455 (3d Cir. 2003) (citation omitted).

  B.  *Standing*

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." *Lance v. Coffman*, 549 U.S. 437, 439 (2007). Standing itself is "a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Furthermore, "[t]he standing inquiry . . . focuse[s] on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Constitution Party*, 757 F.3d 347, 360 (3d Cir. 2014) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)) (alterations original). To demonstrate standing, a plaintiff must establish: "(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *In re Nickelodeon Consumer Privacy Litig.*, 827

F.3d 262, 272 (3d Cir. 2016) (quoting *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016)) (internal quotations and citations omitted). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 136 S. Ct. at 1547 (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).

Importantly, a "litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 474-75 (1982); *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 538 (3d Cir. 1994). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)) (footnote omitted). Specifically, to allege injury-in-fact, "a plaintiff must claim the invasion of a concrete and particularized legally protected interest resulting in harm that is actual or imminent, not conjectural or hypothetical." *Nickelodeon*, 827 F.3d at 272 (quoting *Finkelman*, 810 F.3d at 193) (internal quotations omitted). A harm is "concrete" only "if it is 'de facto'; that is, it must actually exist"—it cannot be merely "abstract." *Id.* (quoting *Spokeo*, 136 S. Ct. at 1548).

Here, Defendants move to dismiss the Complaint on the basis that Plaintiff lacks Article III standing. I agree.[3] As discussed above, a justiciable controversy must be definite and concrete, "admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Wyatt v. Gov't of the Virgin Islands*, 385 F.3d, 801, 802 (3d Cir. 2004). The genesis of Plaintiff's Complaint is that O'Donnell denied his license application based on biased and capricious reasoning. Compl., ¶ 28.

---

[3] Because Plaintiff lacks standing, Defendant's argument that Plaintiff's claims for damages are barred by the doctrine of sovereign immunity will not be addressed in this Opinion.

However, as the Complaint also makes clear, O'Donnell's letter clearly informed Annunziata that O'Donnell would not *recommend* him for a NJRC license due to his alleged continuing involvement with racing without a current NJRC license; the letter does not explicitly state that Annunziata's application is denied, or even that it had been reviewed by the NJRC. *Id.*

In New Jersey, the NJRC, alone, has the full power and authority to "prescribe rules, regulations and conditions under which all such licenses are issued in the State of New Jersey and to revoke or refuse to issue a license if in the opinion of the commission the revocation or refusal to issue such license is in the public interest . . . ." N.J.S.A. 5:5-33; *see Delguidice v. New Jersey Racing Com.*, 100 N.J. 79, 90 (1985). In that regard, "[a] board of examiners composed of the State Steward and two associate stewards shall examine" licenses for stable employees. *See* N.J.A.C. 13:70-4.6. Based on New Jersey's regulatory scheme in this context, only the Board of Examiners — not the Steward alone — can issue a decision approving or denying license applications. In his Complaint, Annunziata does not aver that the NJRC denied his license application, or that the Commission refused to process it; Plaintiff has only alleged that O'Donnell would not recommend him for a NJRC license. Compl., ¶27. Moreover, Plaintiff has not alleged that the NJRC has somehow stayed the application process pending this litigation. Rather, it appears that the application is still pending before the NJRC.

Thus, at the time that the Complaint was filed, the Board of Examiners had not had the opportunity to consider Plaintiff's application. Indeed, after its eventual consideration, the Board may deny Plaintiff's stable license for the reasons that O'Donnell recommended, *see* N.J.A.C. 13:70-4.7, it may deny it on other grounds, or it may approve his application. The Board may also conduct additional hearings to inquire as to any other facts in order to make a determination on Plaintiff's application. *See* N.J.A.C. 13:70-4.8. While the letter sent by O'Donnell indicated that

7

Plaintiff may appeal his "refusal for recommendation," the Board of Examiners has not taken any action set forth by the Administrative Code, and as such, for the purposes of this suit, I cannot find that O'Donnell's letter constitutes a formal denial on behalf of the NJRC.

The "case or controversy" threshold of Article III requires that Plaintiff has standing to bring his § 1983-related claims. Because his stable license application appears to be pending and has not been formally denied by the NJRC, Annunziata has not suffered an injury-in-fact sufficient to meet the standing requirements. Rather, the alleged injuries that Annunziata seeks to redress are merely hypothetical, not concrete and particularized. While I find that Plaintiff lacks standing to bring this suit based his pleadings, I am also concerned that the appeal-related language in O'Donnell's letter added some confusion to the status of Plaintiff's stable license. Therefore, without any further information as to Plaintiff's license application, it is prudent to permit Plaintiff fifteen days, from the date of the Order accompanying this Opinion, to amend his pleadings to attempt to satisfy his standing to bring suit. [4]

---

[4] Notably, even if O'Donnell's letter constituted an official denial on behalf of the NJRC, I still question whether jurisdiction exists, because Plaintiff has admitted that he chose not to pursue his administrative remedies, i.e., administratively appeal, and thus, failed to exhaust his administrative remedies. In that regard, should Plaintiff choose to amend his Complaint, he must take into account exhaustion requirements and provide sufficient allegations as to why he should be excused from those requirements.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**. Plaintiff's claims are dismissed without prejudice; however, in lieu of dismissal, Plaintiff is given leave to amend his Complaint within fifteen days from the date of the Order accompanying this Opinion.

Dated: October 3, 2017                               /s/ Freda L. Wolfson
                                                    Freda L. Wolfson
                                                    United States District Judge